## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | **No.   23-cr-068 (ABJ)** |
| ) | |
| **JASON FARRIS** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Jason Farris is a 45 year old man who has continually expressed sincere remorse for his conduct on January 6, 2021. In fact, he participated in a voluntary interview with the Federal Bureau of Investigation (FBI), where he admitted to facts that incriminated him further. Even after that interview, he offered to continue to cooperate with the government. Mr. Farris has also voluntarily completed community service since his case has been pending out of a desire to give back to his community and atone for his mistakes.

Mr. Farris traveled to D.C. alone on January 6, 2021, with no riot gear or weapons, and was not part of any organized groups. He also only entered the Capitol building for two minutes –entering to then find a door immediately to exit. Rather, Mr. Farris was among the crowd of mostly ordinary Americans who were influenced by the riled up crowd. Mr. Farris's assault on an officer was a horrible mistake but was short-lived. Mr. Farris wrote a sincere letter to the victim of the assault apologizing for his actions since entering a plea of guilty.

Ever since January 6, 2021, Mr. Farris has been focused on work and has completely distanced himself from the events that day. Considering Mr. Farris's background and his conduct on January 6, and the rest of the 3553(a) factors, a significant variance below the guideline range is more than warranted.

## BACKGROUND

Before January 6, 2021, former President Trump encouraged millions of ordinary Americans to travel to D.C. to attend the "Stop the Steal" rally, where he would further encourage them to go to the Capitol building to protest the certification of the Electoral College vote. The former President summoned his supporters to D.C. based on claims that the 2020 Presidential election was "stolen" from him.[1] This claim was repeated to the public over and over again, beginning immediately after the election when the former President falsely declared victory.[2] The former President led ordinary Americans like Mr. Farris, who were not experts in election law, to believe or suspect that irregularities existed in the election and vote count and that the purported fraud would be uncovered if people demanded action. He held rallies all over the country, repeating these claims and firing up his base of followers.

Below are examples of some of the political rhetoric that was spreading through the Trump supporter community prior to January 6, 2021, that came

---

[1] Shivaram, Deepa, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release.

[2] *Id.* at pg. 36 of final report.

directly from former President Trump:

> WE HAVE JUST BEGUN TO FIGHT!!!
> **_Tweet from Trump on December 12, 2022_**.[3]

> A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!
> **_Tweet from Trump on December 19_**.[4]

> The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th.[5]
> **_Trump tweet from December 26, 2022_**.

> If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better.
> **_Retweet by Trump on January 3, 2022_**.[6]

> If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back."
> **_Trump's words at a rally in Georgia on January 4, 2021._**[7]

> If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!
> **_Tweet from former President Trump at 1:00 am on January 6, 2021._**[8]

---

[3] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Insttitute, January 11, 2021, available at
https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *January 6 Report* at 61.

Also during this time, many Trump followers were angry and resentful about the effect that the COVID-19 Pandemic restrictions had on small businesses and those in places of employment that were shut down because of the restrictions. The former President contributed to the tension by putting into doubt the necessity of the restrictions as well as calling into doubt the science behind vaccinations and the use of masks. By the time January 6, 2021, came around, Americans who believed Trump wholeheartedly had built up resentment after the claims of election fraud and real issues that affected their livelihood.

On January 6, 2021, Mr. Farris attended the rally he was invited to by his President, where he listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right."[9] Former President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Farris) on January 6, 2021:

> We will not let them silence your voices. We're not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll

---

[9] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave**.[10]

Following this rally, thousands of ordinary Americans who ordinarily would not have ventured to the Capitol building did so because of their own President's words. Even as the Capitol building was under attack, President Trump did and said nothing for hours.[11] The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution."[12]

## ARGUMENT

### I.    Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007),

---

[10] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).
[11] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737
[12] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

have dramatically altered the law of federal sentencing. While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[13] As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*. 2009 WL 160585, at *1. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not be presumed reasonable." *Id.* At *2. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that

---

[13] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a).

constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

## II. Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

### a. Mr. Farris's Personal History and Characteristics

Mr. Farris was born and raised in a small town in Illinois with an older sibling. His father, a war veteran and then Catholic priest, sadly passed away from a heart attack when Mr. Farris was not even one year old. As such he grew up without a father, which had a significant impact on him. Given the loss of her spouse, Mr. Farris's mother had to pick up the slack to earn the income for the family. She worked hard and had a great career as a clinical social worker and a part-time police officer for the Illinois Department of Corrections. Naturally, a hard working single mother caring for two boys had its consequences and Mr. Farris often did not have the personal parental support sufficient to overcome early childhood challenges.

As a young child, Mr. Farris thrived playing sports but did not excel with his academics. He always regrets that he did not live up to his full potential and knows that he could have done better to earn good grades. He graduated high school but did not go on to earn a higher education degree.

Mr. Farris moved to Florida when he was 19 years old. Unfortunately, Mr. Farris began to use harmful narcotics after a few years of using marijuana. In 2005, he met the mother of his now 17 year old son. They were together for about a year. Unfortunately, she also struggled with substance abuse addiction. When they split

up, Mr. Farris went through several years of custody battles and fought to be able to be with his son. It was through this process that Mr. Farris became sober out of a desire to gain stability for his son. From 2007-2019, Mr. Farris's entire focus was being in his son's life as much as possible. Mr. Farris moved his life around and moved cities to be where his son was. For example, he moved to Texas after his son's mother took him there. She was still struggling with substance abuse addiction and at some point she checked into a rehab facility in Florida while Mr. Farris was caring for his son. When she returned, they finally reached a mediation agreement in which Mr. Farris agreed to relocate to Florida. This back and forth went on for years but Mr. Farris's primary motivation was always to be with his son.

In the meantime, Mr. Farris was always able to get work, mostly minimum wage jobs, learning construction and carpentry and other trades such as welding and accounting throughout the years. Not only did Mr. Farris struggle with substance abuse, but he also struggled with his mental health. *See* PSR Par. 79-92. He was treated for both over the years and now is completely sober after attending AA for 6 months while staying at a halfway house. Mr. Farris still struggles with depression, especially related to the instant offense.

At the start of the COVID-19 pandemic, Mr. Farris's son went to visit his grandmother (Mr. Farris's mother) for the summer. He was supposed to go to a camp there in California where she lived but because of the pandemic, the camp was shut down. What started out as just a visit ended up being a long term stay

with Mr. Farris's mother. The year 2020 was extremely challenging for Mr. Farris mentally as it was difficult for him financially to survive with all of the COVID related restrictions that impacted small businesses. Mr. Farris got drawn into the political tensions that arose from these COVID restrictions that were intertwined with the 2020 Presidential Election. Unfortunately, Mr. Farris's teenage son disagreed with his father's politics and it caused tension between them. This as well as school issues related to the pandemic led to Mr. Farris's son remaining with his mother in California. He is still there currently but Mr. Farris hopes to reunite with him soon.

Despite Mr. Farris's son living apart from him, he is still a large part of his life and financially supports him to the best of his ability. After a long time of instability, Mr. Farris finally has a good and steady job working for Star Glass & Mirror as an accountant in Arlington, Texas. Mr. Farris's boss and CEO of the company speaks very highly of him and describes him as a "key part of operations," as well as a "good and hardworking man, very honest and upright," who has expressed to him on several occasions that "he wishes he was not have gone to DC..and regrets what happened there." *See* Exhibit 1, Letter from Employer.

Mr. Farris's focus has been on work in the past couple years and he is doing his best to gain stability for him and his son. He has been living simply, going to and from work via bike where he cycles 16 miles a day to get to work and then back home each day. Mr. Farris is in a very different place now then he was prior to his offense conduct. He has finally accomplished a positive situation, mentally,

physically, and financially, things that he did not have prior to January 6, 2021 –
things that if he had at the time would have prevented him from being involved in
the events that day.

### b.  Nature and Circumstances of the Offense

On January 6, 2021, Mr. Farris traveled alone to D.C. and certainly was not a
part of any organized groups. He did not have weapons or any riot gear, just jeans, a
backpack, and a red Washington Nationals hat. Men like Mr. Farris were not only
pawns of the Trump campaign, but more organized groups on January 6, 2021, like
the Proud Boys, who also intended to rile up normal people in the crowd to serve
their agenda. The New York Times investigated this dynamic and learned that
there were different groups who went to the Capitol building, ones that simply
intended to protest peacefully and others with a plan to incite the crowd and breach
the building.[14] The Proud Boys called people like Mr. Farris "normies" and had an
intent to rile them up in order to support their agenda.[15] Mr. Farris went to D.C.
naively being completely unaware of the powers at be that had paved the way for
the perfect storm of January 6. He was used to serve a purpose and is now a two
time felon because of it. In the sentencing of Andrew Cavanaugh, the Honorable
Amit P. Mehta opined that perhaps some January 6 defendants are victims too and

---

[14] New York Times, Proud Boys Led Major Breaches on Jan. 6 Video, July 11, 2022,
available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html (last
viewed on April 7, 2023).
[15] Reneau, Natalie, New  York Times, How the Proud Boys Breached the Capitol on Jan. 6:
Rile up the Normies, June 17, 2022, available at
https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-
proud-boys-breached-the-capitol.html

were ordinary Americans with no criminal history who were subject to the "power of being told lies over and over again by leaders who knew better." *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-27.

Now that Mr. Farris has had time to reflect, he deeply regrets his behavior and sincerely feels tricked by the former President for baiting individuals like him to have strong anger and entitlement that day. Mr. Farris's obsession with the politics of the pandemic and his anger and frustration led him to D.C. Still, he blames himself for his poor choices on January 6, 2021, that led him to being convicted of a serious felony. Mr. Farris also regrets getting drawn into the extreme politics and no longer subscribes to those dangerous ideas. Mr. Farris's actions ever since January 6, 2021, show his strong character in taking responsibility for what he did. Immediately upon being arrest on February 8, 2023, Mr. Farris told officers that the backpack he had with him at his first hearing was the same one he had at the Capitol grounds on January 6, 2021. He also gave a voluntary interview that same day where he provided details of his conduct on January 6, 2021. Mr. Farris did not initially recall fully pushing an officer, but later did when shown the videos by current counsel. He did, however, in that interview admit to having confrontations with police – which he sincerely regrets. Mr. Farris also incriminated himself by providing details that law enforcement likely would not have uncovered but for his statements.

Since Mr. Farris's case has been pending, he has been overall compliant on pre-trial release, has been focusing on his employment and living a simple life. He

has disengaged from the strong political views that led him to his offense conduct.

In fact, he has offered to continue cooperating with the government multiple times.

Mr. Farris has also accepted responsibility for his assault of the victim. He has

expressed sincere remorse to the victim by writing a letter to him.[16] *See* Exhibit 2,

Letter to JW. Mr. Farris apologizes to him and says:

> On that day, I lost sight of what was right and wrong for some stupid
> reason. I let the emotion take over in a destructive way and lost my
> mind. What I did was stupid, disgusting, and wrong, and I think about
> it every day. Not just because I got caught..but because of the blatant
> disrespect that I showed to you, to the other law enforcement men and
> women there that day, and to the Nation as a whole.

*Id.*

While Mr. Farris does have mostly an old and petty criminal history, he has

never engaged in assaultive conduct. He will, as he stated, regret his offense for the

rest of his life. In fact, ever since January 6, 2021, he has struggled with depression

over what he did. He is trying his best to focus on the positive accomplishments and

relationships he has formed since. Mr. Farris also wishes to be an even bigger part

of his son's life moving forward. Last October, Mr. Farris, on his own without any

prompting, completed 6 hours of community service at the Arlington Parks &

Recreation Center out of a desire to be positive and give back to his community. *See*

Exhibit 3, Community Service Record.

Many friends, family, and co-workers, have shown their support of Mr. Farris

despite his conduct because of their strong belief that his conduct does not represent

---

[16] This letter was provided to the government counsel to provide to the victim on January
31, 2024. As such, the government was aware of this letter prior to its submission of its
sentencing memorandum.

who he is. Mr. Farris's uncle writes to the Court explaining how Mr. Farris has helped the family over the years and how his character is to above and beyond to do the tough jobs to make it easier on his family. *See* Exhibit 4, Letters of Support, Letter from Uncle Norval. Mr. Farris's uncle also explains that Mr. Farris is not a violent person and he knows "Jason is a good person…and will accept the consequences of his actions, learn and grow from them and move forward." *Id.*

Mr. Farris's second cousin also writes to the Court describing Mr. Farris as a good natured person who "if someone is sad, lonely, or ailing, he will go out of his way to offer a loving shoulder to help." *Id.* Letter from cousin Lisa. She also explains how Mr. Farris has expressed remorse "for his many bad decisions leading up to his participation in the crimes he pleaded to." *Id.*

Mr. Farris's co-tenant describes him as a respectful individual and a "standup member in the neighborhood." *Id.* Letter from Daniel Firew. Mr. Farris has also expressed remorse to Mr. Firew as he explains in his letter. *Id.* It is no surprise that Mr. Farris's landlord also describes him as the same and explains that he "has been one of my most reliable tenants," and he is "clearly remorseful about his being at the Capitol." *Id.* Letter from landlord.

All of the letters of support share the same themes, that Mr. Farris is a caring and hardworking person who has recently found his "niche" at his current place of employment. With this stability and support, Mr. Farris will undoubtedly continue to succeed.

**c.  The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate**

**Deterrence, and the Need to Avoid Unwanted Sentencing Disparities**

Based on the past three years, the Court can be assured that Mr. Farris will not repeat the same conduct. Firstly, Mr. Farris's compliance on pre-trial supervision has been almost perfect. Second, in the past 3 years since his offense conduct he has shown that his focus is solely on work and maintaining stability. He is not focused on politics and will not fall into the dangerous mentality that led to his conduct ever again.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of similar and more aggravating conduct further demonstrates that a significant variance is warranted in the instant case.[17]

> • *US v. Joseph Leyden*, 22-cr-314 (TNM): This case is fairly similar to Mr. Farris's case in that Mr. Leyden also pled guilty to one count of 18 U.S.C. §111(a) and admitted to pushing a police officer on the Capitol grounds. Mr. Leyden was sentenced to 6 months' incarceration despite the government's request for 27 months' incarceration.

> • *US v. Kaleb Dillard,* 23-cr-049 (JMC): Mr. Dillard's conduct was more aggravating than Mr. Farris's conduct. Mr. Dillard was convicted of one count of 18 U.S.C. §111(a) after admitting that he smashed a window at

---

[17] This analysis in no way suggests that the sentences imposed were appropriate and are based on what was provided on the public docket regarding government allegations and defendant admissions.

the East Rotunda Doors and pushed a police officer to the ground. Mr. Dillard received a sentence of 10 months' incarceration. Although Mr. Farris struck a window, he did not actually break it. Mr. Dillard's window breach contributed to the rush of individuals entering the East Rotunda Door.

• *US v. James McNamara*, 23-cr-119 (ABJ): Mr. McNamara also pled guilty to one count of 18 U.S.C. §111(a). Mr. McNamara was sentenced to 12 months' incarceration, a variance below the guideline range of 24-30 months. Mr. McNamara allegedly swung at a police officer with a *closed fist* and grabbed a metal barricade and slammed it into an area the police were trying to secure. Like Mr. Farris, Mr. McNamara also seemed to have a challenging background.

• *US v. Troy Sargent,* 21-cr-258 (TFH): Defendant was sentenced to 14 months' incarceration after convictions for Civil Disorder and Assault on a Police Officer. Mr. Sargent admitted to trying to swing at an officer with his open hands twice. He also admitted to posting a message after January 6, 2021, that he had hit a police officer twice. However, he also accepted responsibility early and had a challenging past.

Lastly, while Mr. Farris was not convicted of Civil Disorder, it is worthwhile to consider the sentences imposed in cases where defendants were convicted of Civil Disorder because while the sentencing guidelines are substantially lower, the

overall conduct in those some of those matters involves "assaultive" conduct even though they were not ultimately convicted of assault.

- *US v. David Blair,* 21-cr-186 (CRC): Mr. Blair was sentenced to 5 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Blair was accused of bringing tactical gloves, carrying a lacrosse stick with a large Confederate flag attached to it and using that stick to push against a police officer's chest. The government also alleged he carried a backpack with a knife and roll of duct tape inside.  Mr. Blair never made it inside the Capitol building because he was detained on the spot after allegedly assaulting officers with his stick.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Mr. Johnson was sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson allegedly pushed against a line of officers who were guarding the East Rotunda doors trying to prevent rioters from gaining entry to the building. The pushing of rioters caused these officers to be sandwiched against the doors and the effort of the rioters were successful as that door was breached. Mr. Johnson also allegedly said afterwards that he was trying to find a way into the Senate Chamber.

- *US v. Robert Fairchild*, 21-cr-551 (TFH): Mr. Fairchild was sentenced to 6 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Fairchild admitted to engaging with officers to try to break through the metal

barriers making contact with law enforcement with his back and shoulders as he tried to tussle with the barriers to breach the area.

## General Deterrence

Sentencing Mr. Farris to a significant period of incarceration is not the way to ensure that the isolated events on January 6 will never occur again. An event like January 6 is unlikely to happen again[18] Empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[19] Individuals like Mr. Farris have already been deterred by this threat of prosecution. Most individuals involved in January 6, 2021, were encouraged to do what they did by the most powerful executive in our country and yet the government has not hesitated to prosecute these individuals to the fullest extent possible. Individuals like Mr. Farris, who are not activists, would be deterred just by the prospect of such a harsh prosecution and the collateral consequences that result from a felony conviction. For these reasons, the goal of general deterrence would be more than met by a variant sentence.

## CONCLUSION

---

[18] *See* transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").

[19] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

For the reasons stated above, Mr. Farris respectfully requests that the Court grant a significant variance based on the factors outlined in 3553(a).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org